**FAEGRE DRINKER BIDDLE & REATH LLP**
By: David J. Woolf (I.D. No. 026131995)
   Matthew A. Fontana (I.D. No. 001182012)
105 College Road East
P.O. Box 627
Princeton, NJ 08542-0627
(609) 716-6500

_____

| | | |
|---|---|---|
| FREEDOM MORTGAGE CORPORATION, | : | |
| | : | |
| | : | |
| Plaintiff | : | UNITED STATES DISTRICT COURT |
| | : | FOR THE DISTRICT OF NEW JERSEY |
| v. | : | |
| | : | |
| KEVIN FITZPATRICK and | : | |
| THOMAS OLSEN, | : | JURY TRIAL DEMANDED |
| | : | |
| Defendants. | : | |
| | : | |

_____

## <u>COMPLAINT</u>

Plaintiff Freedom Mortgage Corporation ("Freedom Mortgage"), by its undersigned

counsel, hereby alleges against Defendants Kevin Fitzpatrick and Thomas Olsen as follows:

### PRELIMINARY STATEMENT

When Defendant Thomas Olsen no longer wished to work for Freedom Mortgage, he

chose to go to a competing business, Carrington Mortgage ("Carrington"). While he had the

opportunity to leave quietly, he instead solicited other Freedom Mortgage employees to join him.

Defendant Olsen sought to deprive Freedom Mortgage of its talented workforce—in direct

violation of the agreement he entered into with Freedom Mortgage as a condition of his

employment—for the nefarious and unlawful purposes obtaining an unfair competitive

advantage for his new company.

One of the employees that Defendant Olsen succeeded in poaching from Freedom Mortgage was Defendant Kevin Fitzpatrick. Even though Defendant Fitzpatrick had signed an agreement with Freedom Mortgage that restricted his ability to work for a competing company for a limited period of time, he chose to join Defendant Olsen in working for Carrington anyway. Like Defendant Olsen, Defendant Fitzpatrick was not satisfied with a quiet exit. He bragged to Carrington that he would be able to "gather more momentum" than Defendant Olsen in "grabbing" good loan advisors to come over to the competitor with him. Defendant Fitzpatrick then proceeded to solicit other Freedom Mortgage employees to leave, again in direct violation of agreements he had voluntarily entered into with Freedom Mortgage that prohibited such solicitation.

But Defendant Fitzpatrick was not finished. Not only did he attempt to poach Freedom Mortgage's employees, but he also plundered Freedom Mortgage's intellectual property and trade secrets in order to bring them with him to Carrington. During the week prior to Defendant Fitzpatrick tendering his resignation, he transferred hundreds of files from his work computer to his personal e-mail address. These files contained all sorts of confidential and proprietary information, including critical customer data and strategy documents. Defendant Fitzpatrick unlawfully stole Freedom Mortgage confidential information and impermissibly solicited Freedom Mortgage employees to endear himself to Carrington, ignoring the impact on Freedom Mortgage and the wrongfulness of his actions generally.

## PARTIES

1.     Plaintiff Freedom Mortgage is a corporation duly organized and existing under the laws of the State of New Jersey, with its principal place of business located in Mt. Laurel, New Jersey.

2.      Defendant Kevin Fitzpatrick is an adult individual who is a citizen of the State of New Jersey residing at 48 Tudor Ct., Marlton, NJ 08053.

3.      Defendant Thomas Olsen is an adult individual who is a citizen of the State of New Jersey residing at 124 Sequoia Dr., Berlin, NJ 08053.

## JURISDICTION AND VENUE

4.      The Court has personal jurisdiction over Defendants in this action because they have committed torts within the State of New Jersey and have conducted business in the State of New Jersey.  Additionally, Defendant Fitzpatrick's Employment Agreement, Defendants' Confidentiality Agreements, and Defendants' former employment relationships with Freedom Mortgage existed within the State of New Jersey.  Finally, in the Employment Agreement, Defendant Fitzpatrick consented to the jurisdiction of the federal and state courts located in the State of New Jersey for any disputes arising out of the Employment Agreement.

5.      This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because Freedom Mortgage's claims raise a federal question under the Defend Trade Secrets Act of 2016.  Pursuant to 28 U.S.C. § 1367, Freedom Mortgage's remaining claims fall within this Court's supplemental jurisdiction because they are so related to the federal claims that they form part of the same case or controversy.

6.      Pursuant to 28 U.S.C. § 1391, venue is appropriate because a substantial part of the events giving rise to this dispute, and the damages sustained in this dispute, occurred within this district.

## FACTUAL BACKGROUND

### Freedom Mortgage's Business Operations

7.      Freedom Mortgage provides and underwrites mortgage loans to residential and commercial consumers in the highly competitive and cost-sensitive mortgage loan industry.

8.      One of Freedom Mortgage's key competitive advantages in the mortgage industry is its substantial investment in its sales force and pricing and marketing strategy.  Over the past several years, Freedom Mortgage has invested millions of dollars in building its ability to measure the effectiveness of specific marketing campaigns, to determine the efficiency of its sales force in carrying out those marketing campaigns and generally, to recognize and respond to the impact of pricing on its sales results, and to determine the actual and expected return on each dollar of investment in its campaigns, employees, and strategies generally.

9.      Freedom Mortgage's sales force, which includes its Loan Advisors, Senior Loan Advisors, and Producing Team Leaders, is the primary revenue generator for Freedom Mortgage. Loan Advisors are grouped into teams, which are supervised by Sales Managers.  Sales Managers are responsible for the training and supervision of these teams, and as a result they are tasked with maintaining high sales performance from these teams.  Freedom Mortgage employed both Defendant Olsen and Defendant Fitzpatrick as Sales Managers operating out of Freedom Mortgage's New Jersey Call Center.

10.      Freedom Mortgage's sales force receives special training and education with respect to the operations of Freedom Mortgage's business.  Members of the sales force are given access to a broad range of confidential and proprietary Freedom Mortgage information to ensure that they market effectively Freedom Mortgage's mortgage services.  Sales Managers in particular have even greater access to large amounts of Freedom Mortgage's

confidential and proprietary information due to their supervisory authority over the rest of the sales force.

11.    This confidential information includes, but is not limited to the following:

a.    Sales Pitch Techniques—Sales Pitch Techniques are scripts and outlines that instruct members of the sales force how to market Freedom Mortgage's products and services when they call Freedom Mortgage actual and prospective customers.  Freedom Mortgage has tailored these Sales Pitch Techniques through years of experience to give its sales force members the greatest chance to earn a customer's business.  Sales Pitch Techniques are an important part of Freedom's "secret sauce" that makes its sales force one of the best in the market.

b.    Licensing Reports—Freedom Mortgage issues Licensing Reports only to its senior employees.  Licensing Reports contain comprehensive information about the mortgage licenses held by Freedom Mortgage's Loan Advisors.  In addition to cataloguing these licenses, these reports also feature highly confidential productivity statistics, which among other things reveal Freedom Mortgage's sales force investment strategies.

c.    Call Logs—Call Logs are documents created by each Loan Advisor as they speak with Freedom Mortgage actual and prospective customers.  These Call Logs contain highly confidential data including customer names, customer contact information, and comments about each customer's level of interest in applying for Freedom Mortgage services.  Freedom Mortgage analyzes the confidential data gathered from these Call Logs and uses it to determine the most efficient and productive use of its marketing and sales resources.

d.      Rate Pricing Tools—the sales force uses Freedom Mortgage's Rate Pricing Tools to determine the rates it can offer to each individual customer. These tools include sensitive pricing information that is critical to Freedom Mortgage maintaining its competitive edge in the marketplace. Rate Pricing Tools also include complex mathematical formulas designed by Freedom Mortgage that allow its sales force to offer individual customers specific estimates of what he or she will pay for Freedom Mortgage services.

e.      Compensation Plans—Compensation Plans illustrate Freedom Mortgage's confidential compensation formulas for its Loan Advisors and management employees. Freedom Mortgage's competitive compensation formulas are established to reward, and thus enhance, employee productivity and thus give Freedom Mortgage a further competitive advantage with in the industry.

f.      Training Materials—Freedom Mortgage invests heavily in the training and development of its sales force, including by hiring consultants to train its sales force and create related documentation. The Training Materials created by these consultants were developed at great expense to Freedom Mortgage, which considers these materials to be a valuable asset. These training materials have allowed Freedom Mortgage to develop some of the best mortgage loan advisors in the nation.

12.     Freedom Mortgage developed the confidential materials described above, among other materials, through its own efforts, expense, and experience in the mortgage lending industry. These documents and materials are not available to the public and can be prepared only through the expenditure of substantial human capital, over the course of time, and through disciplined efforts at collection and analysis of information. In fact, Freedom's sales teams are

the frequent target of competitor "poaching" precisely because competitors hope to gain access to Freedom's confidential information.

13.     To protect Freedom Mortgage's substantial investment in its sales force and its confidential business information, Freedom Mortgage requires all members of its sales force to sign restrictive covenant and/or confidentiality agreements at the time of hiring and as a condition of employment.

14.     In addition to requiring its employees to sign restrictive covenant and/or confidentiality agreements, Freedom Mortgage also protects its confidential information by prohibiting the removal of confidential information from Freedom Mortgage facilities and maintaining confidential information exclusively on Freedom Mortgage servers.

15.     Specifically, Freedom Mortgage's Information Systems Acceptable Use Policy sets out rules designed to protect the confidential information stored on Freedom Mortgage's computers and networks from misuse by employees.  This policy prohibits "[u]se of the Freedom Mortgage information systems for personal reasons."  It also prohibits the "[u]nauthorized sending, transmitting, or other dissemination of Freedom Mortgage proprietary information … and/or confidential or sensitive Employee information" and attempts "to gain access to information system resources or any data to which [the employee] has no legitimate access rights."  Employees are required to abide by this policy whenever they use their work computers.

### Defendants' Restrictive Covenant Agreements

16.     Defendant Fitzpatrick signed a restrictive covenant agreement prior to the start of his employment with Freedom Mortgage (the "Employment Agreement").

17. By signing the Employment Agreement, Defendant Fitzpatrick agreed to and acknowledged the following restrictions, including restrictions against competition, disclosing or using confidential information, and soliciting Freedom Mortgage employees:

a. "For so long as the [Employee] remains an employee of the Company and for a period of one year after the termination of employment with Company for any reason, as such period may be extended as hereinafter set forth (the "Restricted Period"), the [Employee] shall not, within a 90 mile radius from the greater of (i) the Company's corporate headquarters office, or (2) [Employee]'s principal residence, directly or indirectly, (i) engage in as a principal, shareholder, partner, or director, in any business, which is involved in activities which are in competition with business activities carried on by Company, or being planned by Company, at the time of the termination at any location; or (ii) induce or attempt to influence any employee, customer, independent contractor or supplier of Company to terminate employment or any other relationship with Company." (Employment Agreement, VII, A. 1.).

b. "The [Employee] shall not use for his personal benefit, or disclose, communicate or divulge to, or use for the direct or indirect benefit of any person, firm, association or company other than Company, any Confidential Information. For purposes of this Agreement, "Confidential Information" means all knowledge and information of a proprietary or confidential nature relating to the Company or any of its subsidiaries or affiliates, or the business or assets of the Company or any of its subsidiaries or affiliates, including, without limitation, books, records, agents and independent contractor lists and related information, customer lists and related information, vendor lists and related information, supplier lists and related information, distribution channels, pricing information/policies and profits, cost information, marketing plans and markets, strategies, forecasts, financial statements and financial structuring, budgets and projections, sales, advertisers, product lists and related information, key personnel lists, operational methods, technical processes and methods, plans for future developments, loan processing data, records and reports, systems operations and procedures, all other than (a) information that is generally available to the public on the date hereof or that becomes generally available to the public after the date hereof without action by the [Employee], or (b) information that the [Employee] receives from a third party who does not have any independent obligation to the Company to keep such information confidential." (Employment Agreement, VII, A. 2.).

c. "Confidential information also includes the term "Intellectual Property Rights" which means, for purposes of this Agreement, all

intellectual property rights, including, but not limited to, trade names, copyrights, copyright applications, know-how, licenses, trade secrets, discoveries, improvements, ideas, marketing materials, instructions, confidential information, logos and designs, and all documentation and media constituting, describing, or relating to the foregoing, including, without limitation, manuals, memoranda, and records."
(Employment Agreement, VII, A. 2. a.).

d.      "Any and all discoveries, ideas, designs, methods, processes, writings. inventions, improvements or other tangible or intangible materials relating in any manner to Company's business, products or services, whether or not patentable and whether or not reduced to practice, which are authored, conceived, created or developed by [Employee]. whether alone or jointly with others, while employed by Company shall be promptly and fully disclosed by [Employee] to Company and shall be the sole, absolute and exclusive property of Company, without the requirement of any further action on the part of [Employee]. At the request and sole expense of Company, [Employee] shall execute, acknowledge and deliver such assignments, conveyances, certificates and other documents which Company may consider necessary or appropriate to properly evidence Company's right, title and interest in said property, and to obtain full protection therefore. Any information related to said property shall be subject to all of the provisions of this Agreement. [Employee] shall not, except with Company's prior written consent, (i) use said properly for his or her own benefit or the benefit of any individual or entity other than Company, or (ii) disclose said property to any individual or entity other than Company employees who have a need to know such property to perform their employment duties."
(Employment Agreement, VII, A. 4.).

e.      "While an employee of Company, and for a period of twelve (12) months after the termination of [Employee]'s employment pursuant to this Agreement, [Employee] shall not directly or indirectly, whether as a principal, agent, officer, director, employee, consultant, independent contractor  or otherwise, alone, in association with or on behalf of any other person, firm, corporation or other business organization:

     1.(i) Solicit, sell, call upon, advise, do or attempt to do business with, otherwise contact or contract with any entity or individual which he knows or reasonably should know to be a current customer of Company, or who has had a loan originated by Company (including through the [Employee]) during the three (3) year period preceding the termination of [Employee]'s employment, or (ii) (A) hire or attempt to hire any current employee of Company, (B) assist in such hiring of any current employee of Company by any other person, (iii) encourage or induce, or attempt to

encourage or induce, any current employee of Company to terminate employment with Company.

2. Engage in or attempt to engage in any business conducting business activities that are the same or similar to those carried on by Company, or being definitely planned by Company, at the time of [Employee]'s termination at any location within a 90 mile radius from the greater of (i) Company's corporate headquarters office, or (2) [Employee]'s principal residence." (Employment Agreement, VII, B. 1-2).

f.      "[Employee] acknowledges that each, every, any and all prospective customers with whom [Employee] comes into contact during the term of [Employee]'s employment, whether by referral, direct origination, marketing or other means, are exclusive prospects or Company. Accordingly, [Employee] agrees and warrants that during the term of [Employee]'s employment and the non-solicitation period set forth in Section VII.B.1 above. [Employee] shall not in any manner refer any such prospective customers to any mortgage services provider or vendor offering similar services as Company or its affiliates, other than to Company or its affiliates." (Employment Agreement, VII, C).

18.    Similarly, upon commencing employment, Defendant Fitzpatrick and Defendant Olsen each signed an agreement that prohibits the unauthorized disclosure or use of Freedom Mortgage's confidential information during employment and for 18 months after employment with Freedom Mortgage terminates (the "Confidentiality Agreement").

19.    The Confidentiality Agreements also contain non-solicitation provisions that prohibit Defendant Fitzpatrick and Defendant Olsen from soliciting other Freedom Mortgage employees to work for another company for 18 months after termination.  Specifically, Section 7 of the Confidentiality Agreements states as follows: "Employee also agrees not to solicit other employees of the Company to leave the Company and to work for the Employee, or any other firm, person or association."

## **Defendant Olsen Disloyally Solicits Freedom Mortgage Employees**

20.    Similar to Freedom Mortgage, Carrington is in the business of originating mortgage loans.  They are direct competitors in that business, often competing for the same clients and employees in the same markets.

21.    Defendant Olsen resigned from his position with Freedom Mortgage on April 17, 2020.  Upon information and belief, Defendant Olsen resigned specifically to commence employment with Carrington, and he is currently so employed.

22.    In the months prior to his resignation—while he was still a Freedom Mortgage employee—Defendant Olsen engaged in a subversive campaign to convince other employees to go to Carrington with him.  He solicited these employees with the purpose of poaching Freedom Mortgage's best employees and giving his new employer, Carrington, an unfair competitive advantage over Freedom Mortgage.

23.    Defendant Olsen acted for the benefit of Carrington at the expense of his employer, Freedom Mortgage.  In doing so, Defendant Olsen breached his duty of loyalty to Freedom Mortgage.

24.    Defendant Olsen engaged in this conduct despite being restricted from doing so by the express terms of the Confidentiality Agreement, and his actions constitute a breach of this agreement.

25.    Upon information and belief, as a result of Defendant Olsen's solicitation, the following four employees separated from Freedom Mortgage and were hired by Carrington in April 2020:

   a.  Defendant Fitzpatrick (separated April 20, 2020)

   b.  Bryon Kelly, Loan Advisor (separated April 17, 2020)

   c.  Dan Marsan, Loan Advisor (separated April 22, 2020)

       d.      Josh Penrose, Loan Advisor (separated April 17, 2020)

26.     Defendant Olsen acted for the purpose of injuring Freedom Mortgage and giving Carrington an unfair competitive advantage in the marketplace.

27.     Defendant Olsen's actions were intentional, willful and malicious.

28.     On April 30, 2020, upon learning that Carrington hired Defendant Olsen (but prior to learning of the other activities described herein), Freedom Mortgage notified Defendant Olsen in writing of the post-separation obligations included in his Confidentiality Agreement. To date, he has not responded.

### Defendant Fitzpatrick Improperly Competes With Freedom Mortgage and Solicits Freedom Mortgage Employees

29.     Upon information and belief, in March 2020, Defendant Fitzpatrick told Carrington that he had spoken with Defendant Olsen about the prospect of leaving Freedom Mortgage and going to Carrington and that Defendant Fitzpatrick was "extremely interested" in doing so. He also communicated that—notwithstanding his ongoing obligations to Freedom Mortgage—if he were to join Carrington, he would be able to "gather more momentum" than Defendant Olsen in "grabbing" good Loan Advisors to "come over" from Freedom Mortgage.

30.     Defendant Fitzpatrick reached an agreement with Carrington, and he resigned from his position with Freedom Mortgage on April 20, 2020 to join Carrington.

31.     By leaving Freedom Mortgage to work for a competing company in the same geographic area, Defendant Fitzpatrick violated the express non-competition terms of the Employment Agreement, which he signed on May 12, 2014.

32.     During March and April 2020—while he was still a Freedom Mortgage employee—Defendant Fitzpatrick engaged in a subversive campaign to convince other employees to go to Carrington with him. He solicited these employees with the purpose of

poaching Freedom Mortgage's best employees and giving his new employer, Carrington, an unfair competitive advantage over Freedom Mortgage.

33.      Defendant Fitzpatrick acted for the benefit of Carrington at the expense of his employer, Freedom Mortgage.  In doing so, Defendant Fitzpatrick breached his duty of loyalty to Freedom Mortgage.

34.      Upon information and belief, because of Defendant Fitzpatrick's solicitation, Loan Advisors Bryon Kelly, Dan Marsan, and Josh Penrose separated from Freedom Mortgage and were hired by Carrington in April, 2020.

35.      Defendant Fitzpatrick's conduct breached and violated not only his duty of loyalty, but also the express terms of his Employment Agreement and the Confidentiality Agreement he signed with Freedom Mortgage.

36.      Defendant Fitzpatrick acted for the purpose of injuring Freedom Mortgage and giving Carrington an unfair competitive advantage in the marketplace.

37.      Defendant Fitzpatrick's actions were intentional, willful and malicious.

38.      On April 30, 2020, upon learning that Carrington hired Defendant Fitzpatrick (but prior to knowing about the other conduct described herein), Freedom Mortgage notified Defendant Fitzpatrick in writing of the post-separation obligations included in his Employment Agreement and Confidentiality Agreement.  To date, he has not responded.

**Defendant Fitzpatrick's Misappropriation of Intellectual Property and Trade Secrets**

39.      During his employment, Freedom Mortgage provided Defendant Fitzpatrick with a work computer for Freedom Mortgage business and a work e-mail address for Freedom Mortgage communications.  This e-mail address is kevin.fitzpatrick@freedommortgage.com.

40.     Upon information and belief, Defendant Fitzpatrick also has a personal e-mail address: biggdoggfitz@yahoo.com.

41.     All Freedom Mortgage employees are required to adhere to the company's Information Systems Acceptable Use Policy.  This policy prohibits, among other things, (a) the use of Freedom Mortgage computers for personal reasons, (b) the unauthorized transmitting of Freedom Mortgage proprietary information, and (c) attempts to gain access to information to which the employee has no legitimate access rights.

42.     Shortly before his resignation from Freedom Mortgage, Defendant Fitzpatrick engaged in the systematic transmission of Freedom Mortgage's confidential information from his work computer to his personal computer.

43.     In fact, between April 14 and April 20, 2020—the week before his resignation—Defendant Fitzpatrick sent dozens of e-mails from his work e-mail address to his personal e-mail address.  These e-mails contained hundreds of files from Defendant Fitzpatrick's work computer and Freedom Mortgage's networks.

44.     These files contained massive amounts of Freedom Mortgage's intellectual property, numerous trade secrets, and a plethora of sensitive and confidential business information, which Defendant Fitzpatrick only had access to because of his leadership position within Freedom Mortgage.  Defendant Fitzpatrick leveraged that access for his own private benefit and the benefit of Carrington, so that he could essentially continue to run his Freedom sales operation while employed by Carrington.

45.     Among other things, Defendant Fitzpatrick took for himself and Carrington the following highly confidential and valuable information:

a. Sales Pitch Techniques—As a Sales Manager, Defendant Fitzpatrick often provided his Loan Advisors with sales pitch techniques to ensure high productivity. Not wanting to part with these valuable tools, Defendant Fitzpatrick sent himself at least 15 scripts, outlines and other proprietary sales pitch techniques. These tools outline how Loan Advisors should market a variety of Freedom Mortgage services and how Loan Advisors should respond to various customer concerns and questions. Rather than invest in creating new sales pitch techniques himself, Defendant Fitzpatrick instead chose to steal the proprietary techniques that Freedom Mortgage has spent years perfecting.

b. Call Logs—Defendant Fitzpatrick sent himself the call logs of several different Loan Advisors. These call logs contained confidential information about more than 1,000 calls, including the names and contact information for numerous actual and potential Freedom Mortgage customers. With these call logs, Defendant Fitzpatrick could target and exploit Freedom Mortgage's relationships with specific customers to steal Freedom Mortgage's business. Rather than put in the hard work of developing his own customer base at Carrington, Defendant Fitzpatrick wants to take a "shortcut" and bring Freedom Mortgage's business with him.

c. Rate Pricing Tools—Defendant Fitzpatrick also sent himself a large spreadsheet containing a treasure trove of Freedom Mortgage's financial data. The particular spreadsheet that Defendant Fitzpatrick took calculates the exact mortgage rate that Freedom Mortgage can offer to a customer and how it should structure each customer's repayment plan. This spreadsheet is the result of years of analysis to determine the lowest rate that Freedom Mortgage can offer to a customer and still be profitable. Using this tool, Defendant Fitzpatrick could determine the exact rate that

Freedom Mortgage would offer to any given customer—a colossal advantage when competing for the same customers.

   d.  Compensation Plan—Defendant Fitzpatrick sent himself a confidential PowerPoint outlining Freedom Mortgage's employee compensation plans for 2020. This PowerPoint, which has "confidential" written on every page, is only available to management-level employees. Not only is employee compensation how Freedom Mortgage recruits and retains talented employees, but it is also how Freedom Mortgage incentivizes its sales force to perform at its best. With this information, Defendant Fitzpatrick provides Carrington an unfair advantage in competing with Freedom Mortgage for the best talent, and also provides Carrington with Freedom Mortgage's compensation system, which has been honed over years to create the sales force with among the highest productivity in the industry.

   e.  Training Materials—As a Sales Manager, one of Defendant Fitzpatrick's duties was to train his Loan Advisors. Not wanting to "start over" and develop his own training tools at Carrington, Defendant Fitzpatrick sent himself several documents containing Freedom Mortgage's proprietary training materials. Among these documents are training materials created exclusively for Freedom Mortgage by an industry consultant at a cost well into the six figures. As part of its heavy investment in its sales force, Freedom Mortgage had consultant train Freedom Mortgage employees and provide related documentation. By taking these training materials, Defendant Fitzpatrick hopes to capitalize on Freedom Mortgage's investment and train Carrington employees using the same techniques, but without the cost.

46.    Not only did Defendant Fitzpatrick unlawfully transfer these files to his personal computer during the last days of his employment with Freedom Mortgage, but he also continued to transfer files from his Freedom Mortgage e-mail address *after* his resignation.  More specifically, on April 21, 2020, the day after he resigned, Defendant Fitzpatrick appears to have logged into his Freedom Mortgage email account remotely and sent to his personal email address a file containing arguably the most confidential information of anything he stole.

47.    This file, a Licensing Report, lists *every* Freedom Mortgage Loan Advisor, and the states in which each Loan Advisor holds a mortgage license, providing Defendant Fitzpatrick with a ready-made list of poaching targets.

48.    The report also includes highly sensitive financial data, including data concerning mortgage applications broken out by Loan Advisor and state.  With this data, a competitor would know the states in which Freedom Mortgage is investing its resources and the Loan Advisors who are most productive, which would allow the competitor to allocate its own resources and pursue Freedom Mortgage Loan Advisors accordingly.

49.    Ultimately, Defendant Fitzpatrick essentially took everything he needs to move to Carrington and run a sales team on its behalf without having to give up the confidential and other materials that allowed him and others to succeed at Freedom Mortgage; in essence, to build a Freedom Mortgage 2.0 model.  And, given the timing and nature of the materials taken, there is no doubt that Defendant Fitzpatrick intends to use this information to give Carrington an unfair competitive advantage against Freedom Mortgage and to convert Freedom Mortgage business to Carrington.

50.    Defendant Fitzpatrick's actions are in direct violation of the terms of his Confidentiality Agreement.  Specifically, in Section 8 Defendant Fitzpatrick agreed that he

would "treat as confidential any information obtained by the Employee concerning customers of the Company or its business, products, techniques, methods, systems" and would not "during the period of employment and anytime thereafter disclose such information in whole or in part to any person, firm, or corporation for any reason or purpose whatsoever."

51.     Defendant Fitzpatrick's actions are also in direct violation of the terms of his Employment Agreement.  Specifically, in Section VII.A.2, Defendant Fitzpatrick agreed that he would not "use for his personal benefit, or disclose, communicate or divulge to, or use for the direct or indirect benefit of any person, firm, association, or company other than [Freedom Mortgage], any confidential information."

52.     Defendant Fitzpatrick has acted for the purpose of injuring Freedom Mortgage and unfairly competing in the marketplace.

53.     Defendants Fitzpatrick's actions are intentional, willful and malicious.

## COUNT I – BREACH OF CONTRACT
## (DEFENDANT OLSEN and DEFENDANT FITZPATRICK)

54.     Freedom Mortgage incorporates herein by reference the allegations of the preceding paragraphs.

55.     Defendant Fitzpatrick's Employment Agreement and both Defendants' Confidentiality Agreements are valid and enforceable contracts.

56.     Defendants entered these Agreements voluntarily in consideration for their employment with Freedom Mortgage and incident to their employment relationships.

57.     The restrictions set forth in Defendant Fitzpatrick's Employment Agreement and both Defendants' Confidentiality Agreements are reasonable and necessary to protect Freedom Mortgage's legitimate business interests and employment relationships.

58.     By the actions described above, Defendant Fitzpatrick has breached the express terms of the Employment Agreement and Confidentiality Agreement that he signed.

59.      Similarly, by the actions described above, Defendant Olsen has breached the express terms of the Confidentiality Agreement that he signed.

60.     By such actions, both Defendants have caused Freedom Mortgage injury and significant damage.

**WHEREFORE**, Freedom Mortgage respectfully requests that this Court:

    a.    Enjoin Defendants from further violations of Defendant Fitzpatrick's Employment Agreement and each Defendant's Confidentiality Agreement;

    b.    Extend the restrictive covenants applicable to the Defendants by the amount of time that they were in breach thereof;

    c.    Award damages against Defendants, including but not limited to contractual and tort damages and all damages provided in the agreements (including all earnings, profits and benefits received by Defendants or Carrington as a result of Defendants' breach) in an amount to be proved at trial;

    d.    Award Freedom Mortgage its attorneys' fees as permitted in the Fitzpatrick Employment Agreement;

    e.    Award Freedom Mortgage its costs and interest; and

    f.    Grant such other and further relief as this Court deems equitable, just, and appropriate.

## COUNT II- BREACH OF EMPLOYEE DUTY OF LOYALTY
### (DEFENDANT OLSEN and DEFENDANT FITZPATRICK)

61.     Freedom Mortgage incorporates herein by reference the allegations of the preceding paragraphs.

62.     Freedom Mortgage and Carrington are in direct competition for qualified personnel who are experienced in the business of originating mortgages.

63.     Defendant Olsen and Defendant Fitzpatrick had a duty loyalty to Freedom Mortgage, and breached their duty of loyalty by engaging in acts of secret competition intended to assist themselves and Carrington, at the expense of Freedom Mortgage's interests.  These acts include but are not limited to taking Freedom Mortgage's confidential information, for their own and/or Carrington's use, and soliciting Freedom Mortgage's employees for employment with Carrington.

64.     Defendant Olsen and Defendant Fitzpatrick have acted for the purpose of injuring Freedom Mortgage, which has suffered damages as a result of Defendant Olsen's and Defendant Fitzpatrick's actions.

65.     Defendant Olsen's and Defendant Fitzpatrick's actions were intentional, willful and malicious.

**WHEREFORE**, Freedom Mortgage respectfully requests that this Court:

a.     Award damages against Defendant Olsen and Defendant Fitzpatrick in an amount to be proved at trial;

b.     Award punitive damages against Defendant Olsen and Defendant Fitzpatrick;

c.     Require the disgorgement of all compensation paid by Freedom to Defendant Olsen and Defendant Fitzpatrick for all times that they were in violation of their duty of loyalty to Freedom;

d.     Award Freedom Mortgage its costs and interest; and

e.     Grant such other and further relief as this Court deems equitable, just, and proper.

**COUNT III- MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT OF 2016**
**(DEFENDANT FITZPATRICK)**

66.     Freedom Mortgage incorporates herein by reference the allegations of the preceding paragraphs.

67.     The confidential and proprietary information that Freedom Mortgage entrusted to Defendant Fitzpatrick, including the confidential information described above, constitute a trade secret because Freedom Mortgage derives independent economic value from that information not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use; and they are subject of efforts that are reasonable under the circumstances to maintain their secrecy.

68.     Due to Defendant Fitzpatrick's employment as Sales Manager of Freedom Mortgage's sales team, he had direct access to and knowledge of Freedom Mortgage's trade secrets, including the confidential information described in Paragraphs 11 and 45-48 above.

69.     The confidential trade secret information obtained by Defendant Fitzpatrick relates to Freedom Mortgages products used in interstate commerce.  As explained above, Freedom Mortgage is a national provider of mortgage services, and the individuals listed on the particular Call Log that Defendant Fitzpatrick took have addresses in numerous different states.

70.     Under the Defend Trade Secrets Act of 2016 ("DTSA"), Defendant Fitzpatrick was prohibited from misappropriating Freedom Mortgage's trade secrets.

71.     As alleged above, the Defendant Fitzpatrick violated these duties by collecting confidential Freedom Mortgage information with the intent to provide it to Carrington and use it to solicit and convert Freedom Mortgage business.

72.     Defendant Fitzpatrick's actual misappropriation of Freedom Mortgage's trade secrets has been willful and malicious.

73.     As a direct and proximate result of Defendant Fitzpatrick's actual misappropriation of Freedom Mortgage's trade secrets, Freedom Mortgage has suffered injury and sustained significant damage.  Moreover, Freedom Mortgage is threatened with additional

and ongoing injuries, including losing current customers, unless Defendant Fitzpatrick is enjoined and restrained by an order of this Court.

74.     Pursuant to 18 U.S.C. § 1836(B), Freedom Mortgage is entitled to damages for actual loss and unjust enrichment caused by the misappropriation of its trade secrets.

75.     Pursuant to 18 U.S.C. § 1836(D), Freedom Mortgage is entitled to recovery of its attorneys' fees.

**WHEREFORE**, Freedom Mortgage respectfully requests that this Court:

a.     Enjoin Defendant Fitzpatrick from the further disclosure and use of Freedom Mortgage's confidential and trade secret information;

b.     Award damages against Defendant Fitzpatrick in an amount to be proved at trial;

c.     Award Freedom Mortgage attorneys' fees, its costs and interest; and

d.     Grant such other and further relief as this Court deems equitable, just, and proper.

## COUNT IV- MISAPPROPRIATION OF TRADE SECRETS UNDER THE NEW JERSEY TRADE SECRETS ACT (DEFENDANT FITZPATRICK)

76.     Freedom Mortgage incorporates herein by reference the allegations of the preceding paragraphs.

77.     As alleged in Count III, the confidential and proprietary information that Freedom Mortgage entrusted to Defendant Fitzpatrick, specifically the information described in Paragraphs 11 and 45-48 above, constitute trade secrets and this information was misappropriated by Defendant Fitzpatrick.

78.     Freedom Mortgage's confidential information, including the information described in Paragraphs 11 and 45-48, provide it with a competitive edge in the marketplace by virtue of the information's secrecy.

22

79.     Under the New Jersey Trade Secrets Act ("NJTSA"), Defendant Fitzpatrick was prohibited from misappropriating Freedom Mortgage's trade secrets.

80.     As alleged above, the Defendant Fitzpatrick violated these duties by collecting Freedom Mortgage's confidential information with the intent to provide it to Carrington and use it to solicit and convert Freedom Mortgage business.

81.     Defendant Fitzpatrick's actual misappropriation of Freedom Mortgage's trade secrets has been willful and malicious.

82.     As a direct and proximate result of Defendant Fitzpatrick's actual misappropriation of Freedom Mortgage's trade secrets, Freedom Mortgage has suffered injury and sustained significant damage.  Moreover, Freedom Mortgage is threatened with additional and ongoing injuries, including losing current customers, unless Defendant Fitzpatrick is enjoined and restrained by an order of this Court.

83.     Pursuant to N.J.S.A. 56:15-4 (a), Freedom Mortgage is entitled to damages for actual loss and unjust enrichment caused by the misappropriation of its trade secrets.

84.     Pursuant to N.J.S.A. 56:15-4 (b), Freedom Mortgage is entitled to punitive damages due to Defendant Fitzpatrick's willful and malicious misappropriation of its trade secrets.

85.     Pursuant to N.J.S.A. 56:15-6 (a), Freedom Mortgage is entitled to recovery of its attorneys' fees.

**WHEREFORE**, Freedom Mortgage respectfully requests that this Court:

a.     Enjoin Defendant Fitzpatrick from the further retention, disclosure and use of Freedom Mortgage's confidential and trade secret information.

b.     Award damages against Defendant Fitzpatrick in an amount to be proved at trial;

      c.       Award punitive damages against Defendant Fitzpatrick in an amount to be proved at trial;

      d.       Award Freedom Mortgage attorneys' fees, its costs and interest; and

      e.       Grant such other and further relief as this Court deems equitable, just, and proper.

## COUNT V- VIOLATION OF THE NEW JERSEY COMPUTER RELATED OFFENSES ACT (DEFENDANT FITZPATRICK)

86. Freedom Mortgage incorporates herein by reference the allegations of the preceding paragraphs.

87. Freedom Mortgage is the rightful owner of Defendant Fitzpatrick's work computer and the computer server that hosts Defendant Fitzpatrick's work e-mail address.

88. After he submitted his resignation on April 20, 2020, Defendant Fitzpatrick was no longer authorized to access Freedom Mortgages computers, including his work computer and work e-mail address.

89. By transferring confidential information from his work e-mail address to his personal e-mail address on April 21, 2020, Defendant Fitzpatrick intentionally accessed Freedom Mortgage's e-mail server without authorization and obtained information from that e-mail server.

90. Defendant Fitzpatrick knowingly and purposefully accessed Freedom Mortgage's server without authorization and obtained data from that server.

91. Defendant Fitzpatrick's taking of Freedom Mortgage's data is a violation of N.J.S.A. 2A:38A-3(a).

92. Defendant Fitzpatrick has disclosed, or plans to disclose, Freedom Mortgage's information to its competitor, Carrington.

93.    As a result of Defendant Fitzpatrick's taking of Freedom Mortgage data and his actual or threatened disclosure of this information a competitor, Freedom Mortgage has suffered damages to its business.

94.    Pursuant to N.J.S.A. 2:A:38A-3, Freedom Mortgage is entitled to compensatory damages, punitive damages, and attorneys' fees and costs.

**WHEREFORE**, Freedom Mortgage respectfully requests that this Court:

a.    Enjoin Defendant Fitzpatrick from the further retention, disclosure and use of Freedom Mortgage's confidential and trade secret information;

b.    Award damages Defendant Fitzpatrick an amount to be proved at trial;

c.    Award punitive damages against Defendant Fitzpatrick;

d.    Award Freedom Mortgage its costs and interest; and

e.    Grant such other and further relief as this Court deems equitable, just, and proper.


Dated:  May 13, 2020

*/s/ David J. Woolf*
David J. Woolf
Matthew A. Fontana
FAEGRE DRINKER BIDDLE & REATH LLP
105 College Road East
P.O. Box 627
Princeton, NJ  08542-0627
(609) 716-6500

*Attorneys for Plaintiff*
*Freedom Mortgage Corporation*

## <u>VERIFICATION</u>

I, James Hayden, verify that I am employed by Plaintiff Freedom Mortgage Corporation ("Freedom") as the Executive Vice President; that I am authorized to make this verification on Freedom Mortgage's behalf; that I have read the foregoing Complaint; and that the allegations in the Complaint are true and correct to the best of my knowledge.  I declare, under penalty of perjury, that the foregoing is true and correct.



James Hayden

Dated:  May 13, 2020